# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | § | |
| | § | Chapter 11 |
| FIRST MESA TANKSHIPS, LLC, *et al.*,[1] | § | |
| | § | Case No. 09-13964 (JAB) |
| Debtors. | § | (Jointly Administered) |
| | § | |
| _____ | § | Section "B" |
| | § | |
| ATLANTIC MARINE ALABAMA, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adv. Pro. No. 09-_____ |
| | § | |
| FIRST MESA TANKSHIPS, LLC, | § | |
| KEET SEEL TANKSHIPS, LLC, and | § | |
| DOS RAVEN TANKSHIPS, LLC, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

Plaintiff, Atlantic Marine Alabama, LLC ("Plaintiff" or "AMA") by and through its

counsel, for its complaint avers as follows:

## SUMMARY OF RELIEF REQUESTED

Plaintiff brings this action pursuant to, *inter alia*, sections 105, 362, 363, 365 and 506 of

title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), and Rule

7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking

declaratory relief set forth more fully below.

_____

[1]  The chapter 11 cases of Keet Seel Tankships, LLC (09-13965) and Dos Raven Tankships, LLC (09-13966) are
being jointly administered with First Mesa Tankholdings, LLC.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the Eastern District of Louisiana (the "Court") has jurisdiction of this proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

2.      Debtors assert venue is properly laid in this District pursuant to 28 U.S.C. § 1409. Plaintiff is investigating the appropriateness of venue in this District and reserves its rights with respect to the same.

3.      Claims 2, 3, 4 and seven of the Complaint constitute core proceedings pursuant to 28 U.S.C. § 157(b), while claims 1, 5 and 6 are non-core.

## THE PARTIES

4.      Plaintiff AMA is in the business of vessel maintenance, repair, overhaul, conversion, and sale, as well as steel fabrication for, among other markets, ocean-going vessels. It is a Delaware limited liability company, with its principal place of business located in Mobile, Alabama, with its mailing address being P.O. Box 3202 (Main Gate Dunlap Drive) Mobile, Alabama, 36652.

5.      Defendant Dos Raven Tankships, LLC ("Dos Raven") is a Delaware limited liability company, doing business in Texas.  Dos Raven is the purchaser of the first of three (3) U.S. Flag chemical/product tankers.  Dos Raven's offices are located at 219 E. Houston Street, Suite 300, San Antonio, Texas, 78205.

6.      Defendant Keet Seel Tankships, LLC ("Keet Seel") is a Delaware limited liability company, doing business in Texas.  Keet Seel is the purchaser of the second of three (3) U.S. Flag chemical/product tankers.  Keet Seel's offices are located at 219 E. Houston Street, Suite 300, San Antonio, Texas, 78205.

7.      Defendant First Mesa Tankships, LLC ("First Mesa") is a Delaware limited

liability company, doing business in Texas.  First Mesa is the purchaser of the third of three (3)

U.S. Flag chemical product tankers.  First Mesa's offices are located at 219 E. Houston Street,

Suite 300, San Antonio, Texas, 78205.

8.      On December 2, 2009, First Mesa, Keet Seel and Dos Raven each filed voluntary

petitions for relief under chapter 11 of the Bankruptcy Code with the Court.

9.      Defendants' chapter 11 cases are being jointly administered.  To date, no trustee

or examiner has been appointed in their chapter 11 cases.

10.     First Mesa, Keet Seel and Dos Raven shall be collectively referred to herein as

"Defendants" or "Purchasers".  AMA, First Mesa, Keet Seel and Dos Raven shall be collectively

referred to herein as the "Parties".

## **GENERAL BACKGROUND**

11.     This action emanates out of a series of three contracts whereby AMA agreed to

partially construct and assemble three ocean going tankship vessels for Defendants and to sell

such vessels to Defendants.  Each vessel was covered by a separate contract, with the totality of

the three contracts being in excess of $124 million.

12.     The vessels were to be constructed using a "virtual shipyard concept."  To be

successful, virtual shipyard construction required, among other things, multiple shipyards using

fully mature drawings with a defined build strategy and master schedule.  Under this approach,

Defendants assumed the role of lead designer, construction manager and equipment and

materials (steel) procurator.  While the vessels were to be ultimately assembled by AMA, major

components of the vessels were to be fabricated by Defendants or other third parties, according

to Defendants' specifications, and provided to AMA in appropriate sequence, defect free and in

otherwise usable form, according to specified deadlines, for AMA to incorporate the components

into the vessels.

13.    Article 2 of each FAC provided that, in exchange for consideration ranging from $39,040,000 to $42,850,000, and Purchasers' completion of other obligations, AMA agreed to perform:

> fabrication, outfit and assembly of certain portions of [each] . . . Vessel's hull, and, under the supervision of the Purchaser and Purchaser's subcontractors, the installation and integration of the remaining components of the Vessel, including without limitation the Casing Module, the Power Module, the Deckhouse Module, and the Main Deck/Pipe Rack Modules, all to be provided by Purchaser as Items Furnished by Purchaser.

14.    Given the complexity of the vessels construction/assembly and in order to complete the vessels on time/budget, Defendants were required to perform various tasks by dates certain.  These included providing AMA with complete design, engineering, drawings, technical data, modules completed by other shipyards and timely payment of invoices and expenses.

15.    From the inception of the project, Defendants failed to meet their obligations in a timely manner.

16.    Defendants' failure to meet their contractual obligation caused AMA to expend thousands of additional man hours to construct the vessels and to incur tens of millions of dollars in un-reimbursed expenses.  Defendants' failures individually and collectively breached the parties' contracts and provided grounds for AMA to terminate the contracts.

## FACTS

17.    On July 2, 2007, AMA entered into three (3) Fabrication and Assembly Contracts ("FACs") with Purchasers, for the serial erection on AMA's shipyard on Pinto Island, Alabama, (the "AMA Shipyard") of certain portions of the hulls of three (3) U.S. Flag chemical/product tankers, Builder's Hull Nos. 103, 104 and 105, respectively, under the supervision of Purchasers.

The FAC with respect to Dos Raven is attached as **Exhibit A** and incorporated by reference for all purposes.[2]

18.     On July 2, 2007, Purchasers entered into a credit facility (the "Credit Facility") with The Royal Bank of Scotland plc ("RBS") to provide 100% of the anticipated cost of construction of the three (3) vessels.  Wilmington Trust Company ("WTC") is the collateral trustee for the Credit Facility.

19.     Pursuant to Paragraph 23.2 of the FACs, AMA was permitted to terminate the FACs if the Purchasers failed to cure a notice of default within thirty (30) days.

20.     On July 2, 2007, AMA executed a Consent Agreement consenting to the provisions of a security agreement between Dos Raven and WTC, in WTC's capacity as collateral trustee under the Credit Facility, which provided WTC with certain rights under the Dos Raven FAC.  A true and correct copy of the Consent Agreement is attached hereto as **Exhibit B** and incorporated herein by reference.  For purposes of this action, the Consent Agreement provided that AMA could not terminate the Dos Raven FAC until it first provides WTC with a period of sixty (60) days to cure any default.  The effect of the Consent Agreement was to provide an additional sixty (60) day cure period solely with respect to WTC.

21.     On July 3, 2007, the Parties executed "Amendments Number 1 to Fabrication and Assembly Contract" for each of the FACs.

22.     The Parties then, on March 5, 2009, executed "Amendments Number 2 to Fabrication and Assembly Contract" for each of the FACs (collectively, the "Amendment Number 2 to the FACs").

23.     Purchasers or their agents made representations to AMA in connection with Amendment Number 2 to the FACs that AMA relied upon to its detriment.  These

_____

[2]  In all material respects, the other two FACs contain terms and conditions similar to those contained in Exhibit A.
{N2084157.1}

5

representations included, *inter alia*, that Purchasers had the financial wherewithal to meet their obligations under the FACs and would be able to satisfy their other contractual obligations in a timely manner.   Absent these representations, AMA would not have entered into Amendment Number 2 to the FACs.   Paragraphs 19 and 20 of the Purchasers' "Motion for Order Under Fed. Rule Bankr. P. 1015(b) Directing Joint Administration of Chapter 11 Cases" (the "Joint Administration Motion") directly contradict the representations that AMA relied upon when it entered into Amendment Number 2 to the FACs.

24.     On or about April and May, 2009, the Parties executed a series of Change Orders, collectively labeled "Change Orders Nos. 3-10."

25.     Purchasers or their agents made representations to AMA in connection with the Change Order Number 10 to the FACs that AMA relied upon to its detriment.  These representations included, *inter alia*, that Purchasers had the financial wherewithal to meet their obligations under the FACs and would be able to satisfy their other contractual obligations in a timely manner.   Absent these representations, AMA would not have entered into Change Order Number 10 to the FACs.   Paragraphs 19 and 20 of the Purchasers' Joint Administration Motion directly contradict the representations relied upon by AMA when it entered into Change Order Number 10 to the FACs.

26.     On or about July, 2007, AMA commenced performance under the FACs.

27.     Shortly after the Parties' obligations under the FACs became due, Purchasers failed to honor their contractual obligations or to timely perform.

28.     Purchasers' breaches of the FACs included but were not limited to:  (a) failures to timely provide mature and completed design and engineering with useable drawings; (b) failures to timely provide Purchaser-furnished materials and equipment required for AMA to complete its

work; (c) failure to provide non-defective materials, equipment and other modules; (d)

Purchasers' constant interference and changes to the construction of the vessels by altering the

pre-Build Strategy and construction sequences for the job; (e) failure to provide change orders in

a timely manner or at all; (f) failure to cooperate and not hinder the performance of AMA under

the FACs; and (g) the general failure of Purchasers to provide the supervision, leadership,

coordination and direction necessary to accomplish the FACs under the virtual shipyard concept.

29.     Purchasers' multiple breaches of their contractual obligations resulted in

substantial added costs and schedule delays in the vessels' construction.  The breaches

individually and collectively provided grounds for terminating the FACs.

30.     Pursuant to Paragraph 6.0 of the FACs, AMA was to receive three forms of

payment from Purchasers.  The three forms consisted of "progress payments," "milestone

payments," and "Builders Cash Flow Payments."  Progress payments were due on an invoice

basis, which invoices were issued every two weeks.  Milestone payments were made upon the

occurrence of pre-defined construction events, such as the setting of the keel or completion of the

hull.  Builder cash flow payments were due whenever the combined progress payments and

milestone payments failed to equal AMA's "cumulative direct project costs, actual expenditures

to implement a capital improvement plan and [AMA's] planned margins . . . . ."

31.     Under the FACs, Purchasers were obligated to reimburse AMA for these

additional costs as they were incurred.

32.     As a result of Purchasers' failure to timely perform, the combined progress

payments and milestone payments failed to equal AMA's project costs, capital improvement

costs and planned margins.  Purchasers were required to meet and confer with AMA in order to

maintain the "Builders Cash Flow Position" and failed to do so.  Despite numerous demands to

do so, Purchasers failed to make the required builder cash flow payments.

33.     Purchasers' failure to make such payments constituted a breach of the FACs and provided grounds for terminating the FACs.

34.     On October 6, 2009, AMA issued a notice of termination, terminating the First Mesa FAC pursuant to Article 9.4 of the First Mesa FAC.  A true and correct copy of the notice is attached hereto as **Exhibit C** and incorporated herein by reference.  Pursuant to the terms of the First Mesa FAC, the termination of the First Mesa FAC was effective on October 16, 2009 – prior to the filing of the above- captioned chapter 11 cases.

35.     On October 6, 2009, AMA issued a notice of termination, terminating the Keet Seel FAC pursuant to Article 9.4 of the Keet Seel FAC.  A true and correct copy of the notice is attached hereto as **Exhibit D** and incorporated herein by reference.  Pursuant to the terms of the Keet Seel FAC, the termination of the Keet Seel FAC was effective on October 16, 2009 – prior to the filing of the above- captioned chapter 11 cases.

36.     On October 6, 2009, in response to the persistent and un-cured breaches of the Dos Raven FAC, AMA issued a notice of default to Dos Raven under the Dos Raven FAC and provided a copy of the same to WTC.  A true and correct copy of the notice is attached hereto as **Exhibit E** and incorporated herein by reference.  Pursuant to the terms of the DOS Raven FAC, Dos Raven had thirty (30) days from October 6, 2009 (*i.e.*, November 5, 2009) to cure the defaults.  Pursuant to the terms of the Consent Agreement, WTC had sixty (60) days thereafter to cure the default (*i.e.*, January 4, 2010).

37.     Dos Raven failed to take any action on or before November 5, 2009, to cure the defaults within its thirty (30) day cure period.  Under the terms of the Dos Raven FAC, Dos Raven is no longer entitled to cure the defaults.

38.     Although the Defendants' chapter 11 cases were filed prior to the expiration of

WTC's sixty (60) day cure period, no cure was attempted or effectuated by WTC.  As certain of

the defaults under the Dos Raven FAC are non-monetary, WTC lacks the ability to cure such

defaults.  AMA is still investigating WTC's standing, if any, to even cure a breach in light of

recent statements by the Purchasers in pleadings filed in the above captioned bankruptcy

proceeding, suggesting that RBS and its agent, WTC, no longer hold a financial interest in the

FACs or vessels.

39.     Each of the FACs expressly provided that Purchasers had been "selected by Shell

Trading (U.S.) Company ('Charterer')" to enter into the FACs and complete fabrication of the

Vessels.

40.     In their bankruptcy filings, Purchasers indicate that the Charterer initiated actions

under the Agreements to Charter on November 5, 2009.  *See* Motion for Joint Administration, ¶

10.  On November 6, 2009, at approximately 7:00 a.m., Richard Horner, Chief Executive Officer

for Purchasers, transmitted to Ed Fleming, acting President for AMA, an email which stated that

the Charterer has withdrawn its support for the fabrication of the vessels contemplated by the

FACs.

41.     Purchasers' management and representatives have stated on numerous occasions

that Charterer, Shell Trading (U.S.) Company, is the funding source for completion of the FACs

and the purchase of the vessels and that, without the financial and logistical backing of this

Charterer, Purchasers would be unable to fund completion and purchase of any of the vessels.

Purchasers' statements to AMA were confirmed in paragraph 6 of the Joint Administration

Motion.

42.     Article 23 of the Dos Raven FAC provides that failure of Dos Raven to make an

undisputed payment to AMA constitutes an event of default under the Dos Raven FAC.  Article

23 provides, in part:

> The following shall constitute an "Event of Default" by Purchaser under
> this Contract:
>
>     23.1    Failure of Purchaser to make an undisputed payment to
> Builder as required under the provisions of Article 6— PAYMENT OF
> CONTRACT PRICE — METHOD OF PAYMENT, but only if payment
> is not received by Builder for a period of five business (5) days after
> receipt of written notice by Builder to Purchaser, Charterer and the
> Administrative Agent of such default.

43.    Without the financial and logistical backing of Charterer, Shell Trading (U.S.)

Company, Dos Raven is not able to pay undisputed payments currently owed to AMA and future

obligations owed to AMA under the Dos Raven FAC.

44.    By correspondence dated November 7, 2009, AMA demanded Dos Raven

immediately provide AMA with commercially reasonable assurances that, even without the

financial support of Charterer, Shell Trading (U.S.) Company, Dos Raven was and remains able

to pay future undisputed payments as they become due to AMA under the Dos Raven FAC.

45.    Dos Raven failed to provide AMA with such commercially reasonable assurances

of its ability to meet its financial obligations under the FACs.  Such failure constitutes

anticipatory repudiation of the Dos Raven FAC.

46.    By letter dated November 14, 2009, Dos Raven confirmed that RBS had formally

declared, on November 13, 2009, that "the credit facility for this project" was in default, thus

confirming that Dos Raven would be unable to pay future undisputed payments as they become

due.  In their bankruptcy filings, Defendants indicate that the "Credit Facility was declared in

default on November 13, 2009, depriving Debtors of any further access to funds to support

vessel construction."  *See* Motion for Joint Administration, ¶ 10.

47.    On November 18, 2009, AMA filed Plaintiffs' First Amended Original Petition

against Dos Raven Tankships, LLC, Keet Seel, LLC, First Mesa, LLC and AHL Shipping

Company in the district court in Harris County Texas, 281st judicial district (Case No. 2009-

72419) (the "Texas Litigation").  In the Texas Litigation, AMA asserts various causes of action

against the defendants, including breach of contract and anticipatory breach of contract.

### COUNT I – DECLARATORY JUDGMENT
**(Action for declaration that Dos Raven cannot cure the Dos Raven FAC and, therefore,
that Dos Raven cannot assume or assign the Dos Raven FAC)**

 48. Plaintiff incorporates by this reference paragraphs 1 through 47 of this Complaint

as though fully set forth herein.

 49. On October 6, 2009, AMA issued a valid notice of default to Dos Raven pursuant

to Articles 23.2 and 25.1 of the Dos Raven FAC.  For the reasons alleged herein and reflected in

the attached exhibits to this Complaint, AMA was justified and within its contractual rights to

issue the notice of default to Dos Raven.

 50. Dos Raven failed to cure its defaults within the thirty (30) day cure period

provided by Article 23.1, which thirty (30) cure period expired on November 5, 2009.

Accordingly, Dos Raven can no longer cure its defaults.

 51. As of the commencement of Dos Raven's chapter 11 case, WTC has failed to cure

the Dos Raven defaults.  WTC's sixty (60) day cure period provided by the Consent Agreement

will expire on January 4, 2010.  However, as certain of the defaults are non-monetary, WTC

lacks the ability to cure such defaults.

 52. The Charterer has withdrawn its support for the fabrication of the vessel

contemplated by the Dos Raven FAC.

 53. RBS has declared the Credit Facility supporting the fabrication and purchase of

the vessels in default on November 13, 2009, depriving Dos Raven of any further access to funds

to support vessel construction and purchase.

54.     Dos Raven is unable to provide adequate assurance of future performance under the Dos Raven FAC.

55.     An actual controversy has arisen and now exists between Plaintiff and Dos Raven, which requires a judicial declaration of their respective rights.

56.     A judicial declaration is necessary and appropriate at this time in order for the parties to ascertain whether:  (i) Dos Raven can cure its defaults under the Dos Raven FAC, (ii) the defaults are subject to cure; (iii) Dos Raven can provide adequate assurance of future performance under the Dos Raven FAC; (iv) Dos Raven can assume the Dos Raven FAC; and (v) Dos Raven has anticipatorily repudiated the Dos Raven FAC.

WHEREFORE, Plaintiff respectfully requests this Court to declare that:  (i) Dos Raven is unable to cure the defaults noticed by Plaintiff in Plaintiff's October 6, 2009 notice of default issued to Dos Raven; (ii) in the alternative, such defaults are not curable; (iii) Dos Raven cannot provide adequate assurance of future performance under the Dos Raven FAC; (iv) Dos Raven has anticipatorily repudiated the Dos Raven FAC; and (v) Dos Raven cannot assume the Dos Raven FAC and that the Court grant such other and further relief as is just and proper

## COUNT II – DECLARATORY JUDGMENT
**(Action for declaration that cause exists to modify the automatic stay to permit Plaintiff to terminate the Dos Raven FAC)**

57.     Plaintiff incorporates by this reference paragraphs 1 through 56 of this Complaint as though fully set forth herein.

58.     On October 6, 2009, AMA issued a valid notice of default to Dos Raven pursuant to Articles 23.2 and 25.1 of the Dos Raven FAC.  For the reasons alleged herein and reflected in the attached exhibits to this Complaint, AMA was justified and within its contractual rights to

issue the notice of default to Dos Raven.

59.    Dos Raven failed to cure its defaults within the thirty (30) day cure period provided by Article 23.1, which thirty (30) cure period expired on November 5, 2009. Accordingly, Dos Raven can no longer cure its defaults.

60.    As of the commencement of Dos Raven's chapter 11 case, WTC has failed to cure the Dos Raven defaults.  WTC's sixty (60) day cure period provided by the Consent Agreement will expire on January 4, 2010.  However, as certain of the defaults are non-monetary, WTC lacks the ability to cure such defaults.

61.    The Charterer has withdrawn its support for the fabrication of the vessel contemplated by the Dos Raven FAC.

62.    RBS has declared the Credit Facility supporting the fabrication and purchase of the vessels in default on November 13, 2009, depriving Dos Raven of any further access to funds to support vessel construction and purchase.

63.    Dos Raven is unable to provide adequate assurance of future performance under the Dos Raven FAC.

64.    The vessel contemplated by the DOS Raven FAC is presently on premises of the AMA Shipyard.  Plaintiff's storage of such vessel prohibits Plaintiff from using its premises to build and construct other vessels and, thereby, generate revenue, which is harmful to Plaintiff. The vessel is a deteriorating asset and requires costs to preserve and store it.

65.    Absent an expedited determination regarding Plaintiff's ability to terminate the Dos Raven FAC, Plaintiff will suffer immediate and irreparable harm.

66.    An actual controversy has arisen and now exists between Plaintiff and Dos Raven, which requires a judicial declaration of their respective rights.

67.     A judicial declaration is necessary and appropriate at this time in order to determine whether cause exists under section 362(d) of the Bankruptcy Code to modify the automatic stay to permit Plaintiff to terminate the Dos Raven FAC.

WHEREFORE, Plaintiff respectfully requests this Court to declare that cause exists under section 362(d) of the Bankruptcy Code to modify the automatic stay to permit Plaintiff to terminate the Dos Raven FAC and such other and further relief as is just and proper.

## COUNT III – DECLARATORY JUDGMENT
### (Action for declaration that cause exists to modify the automatic stay to permit Plaintiff to exercise its post-termination rights under the Dos Raven FAC)

68.     Plaintiff incorporates by this reference paragraphs 1 through 67 of this Complaint as though fully set forth herein.

69.     On October 6, 2009, AMA issued a valid notice of default to Dos Raven pursuant to Articles 23.2 and 25.1 of the Dos Raven FAC.  For the reasons alleged herein and reflected in the attached exhibits to this Complaint, AMA was justified and within its contractual rights to issue the notice of default to Dos Raven.

70.     Dos Raven failed to cure its defaults within the thirty (30) day cure period provided by Article 23.1, which thirty (30) cure period expired on November 5, 2009. Accordingly, Dos Raven can no longer cure its defaults.

71.     As of the commencement of Dos Raven's chapter 11 case, WTC has failed to cure the Dos Raven defaults.  WTC's sixty (60) day cure period provided by the Consent Agreement will expire on January 4, 2010.  However, as certain of the defaults are non-monetary, WTC lacks the ability to cure such defaults.

72.     The Charterer has withdrawn its support for the fabrication of the vessel contemplated by the Dos Raven FAC.

73.    RBS has declared the Credit Facility supporting the fabrication and purchase of the vessels in default on November 13, 2009, depriving Dos Raven of any further access to funds to support vessel construction and purchase.

74.    Dos Raven is unable to provide adequate assurance of future performance under the Dos Raven FAC.

75.    Cause exists to terminate the Dos Raven FAC pursuant to, among other provisions, Article 23 of the Dos Raven FAC.

76.    An actual controversy has arisen and now exists between Plaintiff and Dos Raven, which requires a judicial declaration of their respective rights.

77.    A judicial declaration is necessary and appropriate at this time in order to determine whether cause exists under section 362(d) of the Bankruptcy Code to modify the automatic stay to permit Plaintiff to exercise its post-termination remedies pursuant to the Dos Raven FAC and statute, including, without limitation, the Uniform Commercial Code (the "UCC"), and to determine the obligations of Dos Raven to cooperate with AMA in this regard.

WHEREFORE, Plaintiff respectfully requests this Court to declare that:  (i) cause exists under section 362(d) of the Bankruptcy Code to modify the automatic stay to permit Plaintiff to exercise its post-termination remedies pursuant to the Dos Raven FAC and statute, and (ii) Dos Raven is obligated to cooperate with Plaintiff in accordance with the provisions of the Dos Raven FAC, and Plaintiff requests such other and further relief as is just and proper.

## COUNT IV – DECLARATORY JUDGMENT
**(Action for declaration determining the validity, extent and priority of Plaintiff's liens against the Work and the vessel contemplated under the Dos Raven FAC)**

78.    Plaintiff incorporates by this reference paragraphs 1 through 77 of this Complaint as though fully set forth herein.

79.    On October 6, 2009, AMA issued a valid notice of default to Dos Raven pursuant to Articles 23.2 and 25.1 of the Dos Raven FAC.  For the reasons alleged herein and reflected in the attached exhibits to this Complaint, AMA was justified and within its contractual rights to issue the notice of default to Dos Raven.

80.    Dos Raven failed to cure its defaults within the thirty (30) day cure period provided by Article 23.1, which thirty (30) cure period expired on November 5, 2009. Accordingly, Dos Raven can no longer cure its defaults.

81.    As of the commencement of Dos Raven's chapter 11 case, WTC has failed to cure the Dos Raven defaults.  WTC's sixty (60) day cure period provided by the Consent Agreement will expire on January 4, 2010.  However, as certain of the defaults are non-monetary, WTC lacks the ability to cure such defaults.

82.    The Charterer has withdrawn its support for the fabrication of the vessel contemplated by the Dos Raven FAC.

83.    RBS has declared the Credit Facility supporting the fabrication and purchase of the vessels in default on November 13, 2009, depriving Dos Raven of any further access to funds to support vessel construction and purchase.

84.    Dos Raven is unable to provide adequate assurance of future performance under the Dos Raven FAC.

85.    Upon information and belief, RBS, WTC, as collateral trustee under the Credit Facility, and the Charterer may assert liens against the Work and vessel contemplated by the Dos Raven FAC.

86.    Plaintiff, by operation of Alabama common law and statute, including, but not limited to Alabama Code §§ 35-11-60 and 35-11-110, hereby asserts a valid first priority lien in

and against certain of the Work and the vessel contemplated by the Dos Raven FAC.  Plaintiff

has perfected or will timely perfect its "watercraft lien" liens as may be provided for under

Alabama law.

87.     An actual controversy has arisen and now exists between Plaintiff and Dos Raven

which requires a judicial declaration of their respective rights.

88.     A judicial declaration is necessary and appropriate at this time in order to

determine the validity, extent and priority of the liens asserted in and against certain of the Work

and the vessel contemplated by the Dos Raven FAC.

WHEREFORE, Plaintiff respectfully requests this Court to declare that Plaintiff has a

valid lien in and against certain of the Work and the vessel contemplated by the Dos Raven FAC,

which lien takes priority against all other liens, and such other and further relief as is just and

proper.

## COUNT V – DECLARATORY JUDGMENT
### (Action for declaration that Plaintiff may exercise its post-termination rights under the First Mesa FAC)

89.     Plaintiff incorporates by this reference paragraphs 1 through 88 of this Complaint

as though fully set forth herein.

90.     As set forth above, the First Mesa FAC terminated on October 16, 2009.

91.     An actual controversy has arisen and now exists between Plaintiff and First Mesa,

which requires a judicial declaration of their respective rights.

92.     A judicial declaration is necessary and appropriate at this time in order to permit

Plaintiff to exercise its post-termination remedies pursuant to the First Mesa FAC and statute,

including, without limitation, the UCC, and to determine the obligations of First Mesa to

cooperate with AMA in this regard.

WHEREFORE, Plaintiff respectfully requests this Court to declare that: (i) Plaintiff may exercise its post-termination remedies pursuant to the First Mesa FAC and statute, and (ii) First Mesa is obligated to cooperate with Plaintiff in accordance with the provisions of the First Mesa FAC, and Plaintiff requests such other and further relief as is just and proper.

## COUNT VI – DECLARATORY JUDGMENT
### (Action for declaration that Plaintiff may exercise
### its post-termination rights under the Keet Seel FAC)

93.     Plaintiff incorporates by this reference paragraphs 1 through 92 of this Complaint as though fully set forth herein.

94.     As set forth above, the Keet Seel FAC terminated on October 16, 2009.

95.     An actual controversy has arisen and now exists between Plaintiff and Keet Seel, which requires a judicial declaration of their respective rights.

96.     A judicial declaration is necessary and appropriate at this time in order to permit Plaintiff to exercise its post-termination remedies pursuant to the Keet Seel FAC and statute, including, without limitation, the UCC, and to determine the obligations of Keet Seel to cooperate with AMA in this regard.

WHEREFORE, Plaintiff respectfully requests this Court to declare that: (i) Plaintiff may exercise its post-termination remedies pursuant to the Keet Seel FAC and statute, and (ii) Keet Seel is obligated to cooperate with Plaintiff in accordance with the provisions of the Keet Seel FAC, and Plaintiff requests such other and further relief as is just and proper.

## COUNT VII – DECLARATORY JUDGMENT
### (Action for declaration determining the validity, extent and priority of Plaintiff's liens
### against the Work and the vessel contemplated under the Keet Seel FAC)

97.     Plaintiff incorporates by this reference paragraphs 1 through 96 of this Complaint as though fully set forth herein.

98.     On October 6, 2009, AMA issued a valid notice of termination to Keet Seel pursuant to Article 9.4 of the Keet Seel FAC.  For the reasons alleged herein and reflected in the attached exhibits to this Complaint, AMA was justified and within its contractual rights to issue the notice of termination to Keet Seel.

99.     RBS has declared the Credit Facility supporting the fabrication and purchase of the vessels in default on November 13, 2009, depriving Keet Seel of any further access to funds to support vessel construction and purchase.

100.     Keet Seel is unable to provide adequate assurance of future performance under the Dos Raven FAC.

101.     Upon information and belief, RBS, WTC, as collateral trustee under the Credit Facility, and the Charterer may assert liens against the Work and vessel contemplated by the Keet Seel FAC.

102.     Plaintiff, by operation of Alabama common law and statute, including, but not limited to Alabama Code §§ 35-11-60 and 35-11-110, hereby asserts a valid first priority lien in and against certain of the Work and the vessel contemplated by the Keet Seel FAC.  Plaintiff has perfected or will timely perfect its "watercraft lien" provided for under Alabama law.

103.     An actual controversy has arisen and now exists between Plaintiff and Keet Seel which requires a judicial declaration of their respective rights.  A judicial declaration is necessary and appropriate at this time in order to determine the validity, extent and priority of the liens asserted in and against certain of the Work and the vessel contemplated by the Keet Seel FAC.

**WHEREFORE**, Plaintiff respectfully requests this Court to declare that Plaintiff has a valid lien in and against certain of the Work and the vessel contemplated by the Keet Seel FAC, which lien takes priority against all other liens, and such other and further relief as is just and proper.

Dated:  December 9, 2009

> _/s/ Elizabeth J. Futrell_____
> R. PATRICK VANCE (LA Bar No. 13008)
> ELIZABETH J. FUTRELL (LA Bar No. 5863)
> MARK A. MINTZ (LA Bar No. 31878)
> Jones, Walker, Waechter, Poitevent,
>     Carrère & Denègre, L.L.P.
> 201 St. Charles Avenue, 49th Floor
> New Orleans, Louisiana 70170-5100
> Telephone (504) 582-8194
> Telefax (504) 589-8194
> Email:  efutrell@joneswalker.com
>
> BLANK ROME LLP
> Steven L. Caponi
> David Carickhoff
> 1201 N. Market Street, Suite 800
> Wilmington, DE 19801
> Telephone: (302) 425-6400
> Facsimile: (302)425-6464
>
> _Attorneys for Atlantic Marine Alabama, LLC_

## <u>EXHIBITS</u>

Exhibit A      Fabrication and Assembly Contracts with respect to Dos Raven

Exhibit B      July 2, 2007, Consent Agreement

Exhibits C      October 6, 2009, AMA notice of termination with respect to the First Mesa FAC

Exhibit D      October 6, 2009, AMA notice of termination with respect to the Kleet Steel FAC

Exhibit E      On October 6, 2009, AMA issued a notice of termination with respect to the Dos Raven FAC